## The People v. Samuel Williams and another.

*Jurors: Serving venire.* A conviction by jurors, properly drawn and empanelled, will not be disturbed because the jurors were not summoned by the proper officer.

*Evidence: Inferences: Quality of proof.* Evidence in support of an information for larceny, of facts which were not only no part of the *res gestæ*, but even *res inter alios*, and, while they might support an inference of guilt, were also liable to many other inferences consistent with innocence, is inadmissible; and

PEOPLE v. WILLIAMS.

though the mischievous effect of such testimony was not apparent, a verdict, which may have been influenced by it, will be set aside.

*Criminal law: Larceny: Property:* § 5797, *Comp. Laws.* Money is "property" within the meaning of § 5797, *Comp. Laws,* which enacts that if any person shall feloniously steal the property of another "in any other state or county, and shall bring the same into this state," he shall be guilty of larceny.

*Evidence: Presumption: Possession of stolen property.* Evidence of the larceny of money in another state, together with proof that the accused immediately after came into this state, and here undertook to negotiate for the return of the money, will afford a strong presumption of the possession of the money in this state.

*Criminal law: Larceny: Proof of ownership.* Where money, alleged to be the subject of a larceny, is mingled with that of a person other than the one named in the information,—the title to it remaining unchanged,—it is not necessary that it should be distinguishable, to authorize a conviction.

*Criminal law: Larceny: Statutory offense.* It is competent for the legislature to enact that any person who shall feloniously steal the property of another, in any other of the United States, and shall bring the same into this state, shall be guilty of larceny here, and punished accordingly.

*Inter-state comity: Obligations.* One of the United States, within which property stolen in another, is brought, is bound to render the aggrieved party all proper remedies for its recovery; and this, not merely as a matter of comity, but as one of constitutional obligation; and it is therefore proper that the state should treat the injury as a crime and prosecute for its punishment as such.

*Heard November 3. Decided November 29.*

Exceptions certified from the Recorder's Court of the city of Detroit.

Samuel and Abram Williams were charged, on the information of the prosecuting attorney of Wayne county, before the recorder's court of the city of Detroit, with the larceny of two thousand six hundred dollars, the property of Bernard Williams. They were convicted, and a bill of exceptions was settled and certified to this court before judgment, under the statute.

Upon the empaneling of a jury for the trial of the cause, it appeared that the jurors for the term were drawn by the clerk and sheriff, and that eleven of the jurors on the panel were summoned by *venire* served by the sheriff, for which reasons counsel for defendants challenged the array, which challenge was overruled by the court; to this ruling of the court, counsel for defendants excepted. Upon the trial of the issue, the counsel for the people gave in evidence testimony which tended to show:—

That in the beginning of January, A. D. 1871, the respondents, Samuel and Abram Williams, who were brothers of Bernard Williams, were at the house of said Bernard, in the city of New Orleans, and State of Louisiana, and feloniously took therefrom the sum of twenty-six hundred dollars; that this was on the morning of Friday, and that on the evening of the same day respondents left New Orleans and came direct, except a few hours' stop at Calumet, on Sunday, to the city of Detroit, in the state of Michigan. There was also testimony tending to show that after the arrival in Detroit of Bernard Williams, he met the defendants in said city, and charged them with robbing him of the said money, and with having the same; that some time afterwards, and while Bernard was in jail, charged by the defendant Abram Williams with perjury in making the complaint in this cause, both of the defendants said, that if the said Bernard Williams would take back his complaint in this cause or his charge at the police court (meaning said complaint and the charge therein contained), and say that said two thousand six hundred dollars was claimed by him in á partnership transaction or business, and that the said defendants did not steal said money, they would give him back his money, pay his expenses, and he could go home to New Orleans; that in relation to the same matter the defendant Samuel said, that if he, Bernard, should do this, it would yet cost something to get him out of jail, but that he, Samuel, would give in addition thereto, fifty dollars if Bernard could be induced to make such statement as aforesaid. This was all the testimony produced by the people to show that the money alleged to have been stolen, was brought into said city.

As to the ownership of said twenty-six hundred dollars, Bertha Williams, wife of Bernard, testified on her direct examination: "I told them (respondents) I had twenty-six

hundred dollars that was my own money. I had saved it." On her cross-examination, she testified that the money was her husband's, her son's and her own; that two thousand dollars of it belonged to her husband and herself, and six hundred to her son; that she did not know how much of it belonged to her; that the boy was under seventeen years of age, was a child by her former husband, and made his part of the money by peddling; that she earned her money by keeping boarding-house, and her husband his, by trading; that she kept all the money together, and had been saving it to buy a house with; that her husband gave her over twenty-six hundred dollars to buy a house with; that he (her husband) gave her fifteen hundred dollars by draft.

Bernard Williams was called by the prosecution, and among other matters testified, that two revolvers were missing with the money, and that a license was taken from the same box in which the money was kept; that he had seen the license in Detroit in possession of a man named Bitterman; that Bitterman brought it to the house where witness lived in Detroit, and took out and read the paper, and asked the witness in the presence of his wife and another woman, "Do you know that paper?" and that he, witness, had heard Samuel (meaning respondent) say in police court that Bitterman came to Detroit with them (meaning respondents); that Bitterman stopped in Detroit at Wolf Williams', a brother of respondents, and witness saw him at Samuel Williams'; that he had seen Bitterman at the market with defendants; that Bitterman stopped also at Samuel Williams' house; that witness had seen defendants and Bitterman frequently together, and that they were together the principal part of the time after they arrived in Detroit; that Samuel's statement with reference to Bitterman's coming to Detroit with them, was made in the police court on examination of defendants on this charge. It further

appeared that Bitterman arrived at New Orleans on the day defendants left for Detroit, and was not at the house of Bernard Williams.

All the testimony concerning Bitterman was taken subject to the objection of the defendants, and the objection overruled by the court; to which ruling of the court the defendants excepted.

The recorder was requested by the counsel for respondent to charge the jury:—

That the statute under which defendants are charged is unconstitutional and void;

That the statute under which said defendants are charged does not relate to money, but only to personal property, as distinguished from money, and the defendants must be acquitted;

That there is no evidence in the case that the said defendants brought any part of the money into this state;

That the prosecution must prove that some distinct, separate part of the money in question, is the property of Bernard Williams, and if the proof is that the money in question was owned by Bertha Williams, or by her and Bernard Williams jointly, the defendants must be acquitted; which requests the recorder refused, and the defendants excepted.

The recorder then charged the jury, that the statute under which the information is brought is constitutional;

That the jury have a right to infer, from the facts and circumstances proved in the case, that the defendants brought the money, alleged to have been stolen, into the city of Detroit;

That if the prosecuting witness let his wife have a part of the sum of two thousand six hundred dollars to be kept by her with money of her own, and used by them after-

wards in the purchase of property in their joint names, though the money was all mingled together, so that the part furnished by the prosecuting witness could not be distinguished from that of his wife, then the allegation of ownership in the information as to the part thus deposited with the wife, is sufficiently proved, and will, if all the other material facts are proved, justify a conviction; to which instruction the defendants excepted.

*J. Logan Chipman* and *Geo. V. N. Lothrop*, for defendants.

*Dwight May, Attorney-General*, for the People.

COOLEY, J.

The first exception in this case is, that the jurors were summoned by the sheriff of Wayne county instead of by an officer of the metropolitan police. There is no claim that the jurors were improperly drawn, or that there was any improper conduct by the sheriff. The only complaint is that the wrong officer summoned them. We think there is nothing in this objection. If the jurors, after being properly drawn, had appeared without being summoned at all, no objection could have been taken afterwards; and at most the action of the sheriff can only be treated as a nullity. It is immaterial to this case, therefore, which officer was entitled, under the statute, to serve the venire.

The evidence of the possession of the license by Bitterman, and his exhibition of the same in Detroit, and what he said about it, does not appear to my brethren to have been admissible. These things were no part of the *res gestae;* they were *res inter alios*, occurring afterwards, and the purpose in proving them could only be to afford an inference that the defendants stole the money. But such an inference would be very remote, and the evidence is liable to so many other inferences consistent with innocence, that the court

24 MICH.—21.

cannot look upon it as relevant. It may have done no mischief, but there is always danger in admitting evidence the tendency of which is merely to suggest suspicion while it really proves nothing. For this error the verdict should be set aside.

I have no doubt that the word "property," as employed in the statute, would include money. Money is property; the word used here was the most general that could be employed, and the purpose undoubtedly was to cover every thing which is the subject of larceny.

Nor do I think it true that there was no evidence to go to the jury that the money was brought within the state. It was shown that the defendants came here immediately after the larceny, and that in this state they undertook to negotiate for the return of the money, and to repay it. This was not conclusive, but it afforded a strong presumption of their possession of the money here.

Nor does it seem to me that there is any valid objection to the charge of the court regarding the ownership of the money by Bernard Williams. The charge in effect was, that his delivering his money to his wife, and the putting the same with her own so that it could not be distinguished, in the expectation that it was to be employed for a common purchase, would not preclude its being described as his property in the information; in other words, that it still remained his property notwithstanding such intermingling. This, I think, was correct. There was no necessity for distinguishing by the evidence which dollars belonged to Bernard Williams and which to his wife; it was not even necessary that the parties should be able to do so; it was enough that the dollars belonging to the complainant, whether distinguishable or not, were taken. Proof that such was the case supports the charge.

The principal question in this case arises upon the fact

that the larceny was committed in another state, and that the offense of the defendants within this state, if any was here committed, consisted in bringing within it the property which they had feloniously taken.     The statute provides that "every person who shall feloniously steal the property of another, in any other state or country, and shall bring the same into this state, may be convicted and punished in the same manner as if such larceny had been committed in this state; and in every such case such larceny may be charged to have been committed in any town or city into or through which such stolen property shall have been brought: *Provided,* That every such person may plead a former conviction or acquittal for the same offense in another state or country; and if such plea be admitted or established, it shall be a bar to any further or other proceedings against such person for the same offense."—*Comp. L.,3597.*

This statute is claimed to be invalid. The criminal laws of no state, it is argued, can have force beyond the territorial limits of the state itself, and the state can have no authority to take cognizance of and punish the acts committed elsewhere. A crime is an offense against the sovereignty, and can only be taken notice of and punished by the sovereignty offended; others have no concern in it, and must treat it as matter of indifference. In this case, the felonious act—the taking and asportation *animo furandi*—were within the state of Louisiana, and constituted an offense against its sovereignty which Michigan could not inquire into; the coming by the defendants within this state afterwards was a lawful act, which the state could neither punish nor inhibit. When, therefore, it undertakes to make the larceny a crime here, it, in effect, takes notice of, and assumes to visit with penalties, a wrong committed solely against the peace and dignity of another state, which that state is amply competent to punish if its authorities see fit, and

for the purposes of punishment has ample means, under the constitution of the United States, to reclaim the offenders.

These arguments appear to me to rest for their foundation upon the idea that criminal acts committed abroad are, and must in the nature of things be regarded as, acts to which, as well as to their consequents, our government is indifferent. For if they are acts in which the state or its citizens are concerned; if they tend to disturb the peace and good order of this community, and if persistence in the wrong, after the offender shall have come within this state, can fairly be regarded as a contempt of its dignity and disregard of its sovereign authority, it can not be held that the state is in the position of an indifferent spectator; and if not, it must judge for itself whether that which is offensive shall be punished as a crime or left to be treated as a mere personal tort.

Now whatever might be the true rule had the larceny in question taken place in a foreign country, I am of the opinion that when it takes place in another state of our union, and the wrong is continued within our own state, it is not and cannot be a matter wholly indifferent to our own government. These states all form integral parts of one nation; and though each is sovereign, as regards most matters of interior regulation, they are nevertheless bound by such ties, and subject to such mutual obligations, as preclude one looking on with unconcern when a wrong is being committed against the majesty of the law in another. In some classes of offenses the interest is very direct and immediate, and might subject our citizens to being called upon for aid in repressing them. This would be the case if armed resistance should be made to the authority of another state, and the federal government should summon our citizens to its aid, either by conscription or by requisition upon the governor. It would also be the case should any

attempt be made to abolish republican government and the federal government should interfere, as by the constitution it is required to do. But in other cases our people are necessarily affected in some degree, when offenses are committed against the persons or property of citizens of other states. Every one of those citizens is liable with us in common duties and obligations to the federal government, and whatever prevents his performance of them, or diminishes his capacity or ability to do so, is an injury to every citizen of this state. Moreover, the federal constitution makes the interest still more direct and intimate by the provision that "The citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states." Although what are privileges and immunities is not very definitely settled, it is clear that so far as property rights are concerned, they are to be the same in every other state as in that which is the party's residence. He is to have in every other state, the same protection to property, and the same right to legal remedies when his possession of it is invaded, that are afforded by the state to its own citizens.—*Corfield v. Coryell, 4 Wash., C. C., 380 ; Campbell v. Morris, 3 H. & McH., 554 ; Haney v. Marshall, 9 Md., 194 ; Paul v. Virginia, 8 Wal., 168.* Our state, therefore, in this case, was bound to regard the stolen property, after it was brought within the state, as being still the property of the complainant; was bound to furnish him all proper remedies for its recovery, and to treat the defendants as wrong-doers in withholding it. And all this would be, not mere matter of state comity, but matter of constitutional obligation, imposed in the most solemn manner possible, having for its end and aim the peace and happiness of the community, and the perpetuity of republican institutions; so that the state may well be supposed to be solicitous

to keep the obligation in view, and to perform the duty faithfully.  The wrong of the defendants, therefore, was matter of direct and immediate concern to the state, just as much so as though it had been committed against one of its own citizens.

Now it may be true that this wrong would not have been an offense within this state at the common law; but that does not prevent its being made so by statute.  Many trespasses upon individual rights are made punishable because the interest society has in suppressing such disorders, is such that they may properly be treated as offenses against society.  The present is a case of trespass upon private right, begun, indeed, in another state, but continued into our own, and which the paramount law of the land requires that we should see righted on demand of the party aggrieved.  The persistence in the wrong here, then, as against the right of one whom the state is bound to protect to the full extent that it must protect one of its own citizens, is not only not a matter of indifference to the state, but is a flagrant contempt of its authority, and it is eminently proper that the state should treat it as a crime, if in the opinion of the legislature, the peace and good order of the state demand its punishment.  That such is its opinion, is proved by the statute in question.

It may be suggested that, to sustain this jurisdiction might stand in the way of the performance of the constitutional obligation on the part of the states to return fugitives from justice.  There does not appear to me to be any difficulty on that score.  When one is demanded as a fugitive from justice, the paramount law requires his surrender, and there can be no pretense for refusal when the crime alleged in this state is not the principal offense, but consists simply in persistence in the crime committed in the state demanding him.

For the erroneous admission of evidence, the verdict should be set aside and a new trial ordered.

CHRISTIANCY, and GRAVES, JJ., concurred.

CAMPBELL, CH. J.

Having explained my views upon the validity of the statute now under discussion, in the case of *Morrissey v. The People, 11 Mich. R., 327,* I do not deem it necessary to repeat them at large. I think the law is not within the legitimate authority of this state. The whole act is very peculiar, and the section under which the conviction was had is, both in terms and legal effect, aimed at punishing an offense not committed within any place subject to our jurisdiction, which does not extend into another state. It does not purport to give any new definition of larceny, or to declare the bringing of stolen goods here to be larceny. It allows a former conviction or acquittal, for *" the same offense "* in any other state or country, to bar the prosecution. It recognizes the only larceny which is punished, as having been complete before the property stolen is brought into Michigan. The second section punishes receivers, *"* notwithstanding *such theft* was committed in any other state or country." And the third section punishes aiders and abettors *"* notwithstanding *such theft* was committed in any other state or country ;" and by the settled rules of criminal procedure, aiders and abettors are those who are present at the act as principals in the second degree, and not accessories before or after the fact.—*1 Russ. Cr., 26.* The result is, that the trial for the real offense is had at a distance from the vicinage, and where compulsory process for witnesses is nugatory, because the state cannot compel any one beyond it to come here to testify.

There is another difficulty which makes it less justifi-

able to punish crimes committed in other states, than crimes committed in foreign countries with which we have no legal relations. The constitution of the United States has made it our duty, instead of trying such cases ourselves, to remit them to the *forum* of the offense. This duty is positive and clear. But no state can be bound by any principle of law to deliver up its own offenders to be tried for the same offense elsewhere. In all cases of concurrent jurisdiction the supreme court of the United States has always maintained that the court first getting actual control over the parties or property has a right to retain its control. The lawful judgment of one state must receive full faith and credit in every other. This is the only doctrine which is compatible with peace and good order. If we can punish an act done in Louisiana, our courts cannot be ousted of a lawful jurisdiction after it has once attached; and their judgments cannot be impugned anywhere. It would be a very unseemly thing for the executive of a state to take prisoners out of the hands of state courts; and if they are lawfully there, he has no more right to stop their trial than he would have to try them himself. But the constitution recognizes and enforces the universal rule of law, that none but the sovereignty whose peace has been violated, can redress the violation; and the mandate requiring fugitives from justice to be delivered up has no saving clauses in favor of cases where the fugitive is held for the same offense in the state where he has taken refuge.

It certainly could not be tolerated that a man lawfully acquitted here, or lawfully convicted here and undergoing imprisonment, or having served out his term, should then be delivered over to another state for a new prosecution. We cannot maintain our jurisdiction and deny it at the same time. The facilities for fraud, both for the prosecution and the defense, as each might find evidence more manageable in

one place than another, would open a very wide door to malice and injustice. The common-law presumption, that the testimony in criminal cases will generally be found near the place of the crime, and within the reach of compulsory process, underlies our whole criminal system and its constitutional safeguards. The trial of prisoners in Michigan for Louisiana offenses, is within the mischief which, before the revolution, arose from transporting persons beyond seas for trial—the illegality of which no American jurist ever doubted. And it is, as it seems to me, quite as plain a violation of the constitutional provision concerning fugitives from justice.

I concur in holding that the testimony concerning Bitterman should have been excluded, if the jurisdiction is maintained. And I concur in the other rulings of my brethren not excepted in this opinion.

I think further, that, inasmuch as bringing the property into this state is a jurisdictional condition, it must be positively identified, and that no such identification was made. And I am also of opinion that if Bernard Williams entrusted money to his wife, not as his bailee to keep it intact, but for the purpose, or with permission, to use and mingle it with her own funds, it was no longer his property; but he retained only a personal claim against her for the amount, and it could not be laid in the information as belonging to him.