State v. Mintz.

THE STATE v. MINTZ, Appellant.

Division Two, June 6, 1905.

1. **LARCENY AND FALSE PRETENSE: Distinction.** Where prop-
erty is delivered with the intention of parting with it altogether,
that is, by giving the title as well as the possession, the offense
of obtaining it is that of false pretense. But where the posses-
sion only is parted with, and not the right of property, the of-
fense is larceny.

2. **LARCENY: Goods in Freight Depot: Possession:   Evidence.**
The evidence showed that the freight depot of the "Big Four"
railroad is located in East St. Louis, Illinois, and that freight
shipped over said road and consigned to St. Louis, Missouri, is
hauled from the former place to the latter in freight wagons
of transfer companies; that defendant procured one R., who
had been formerly employed as a driver for a transfer company,
and who was known as such by the delivery clerks at the freight
depot of said railroad, to drive a freight wagon, with which de-
fendant furnished him, to a certain door at said freight depot
and call for a load of shoes to be delivered to a shoe company
in St. Louis.   When R. appeared at the door of the freight de-
pot, he was asked the number of his wagon, which he gave, and
after the usual steps preliminary to the delivery of freight to
drivers, the shoes were delivered to R.,   and he hauled them
to St. Louis, where they were repacked and sold to different
parties.   *Held,* that the dominion of the railroad company over
the freight was not absolute, but was limited to a bare posses-
sion for a particular purpose, namely, that of delivery to the
consignee.   *Held,* further, that the railroad company, in deliv-

ing the goods to R., intended to surrender only such bare possession for such particular purpose, and that defendant, in procuring R. to obtain the goods, was, under the circumstances, guilty of larceny.

3. ————: In Other State: Goods Brought Into This State: Indictment. In a prosecution under section 2362, Revised Statutes, 1899, providing for the punishment of a person who shall steal property in another State and bring the same into this State, and providing, further, that in such case "the larceny may be charged to have been committed, and every such person may be indicted and punished, in any county into or through which such stolen property shall have been brought"—it is not necessary that the indictment charge that the property was stolen in another State and brought into this State. The failure to make such allegation in the indictment is not a violation of the constitutional provision guaranteeing to a defendant the right to know the nature and character of the accusation against him.

4. ————: Agent: Intention: Instruction. Where defendant procures another party to commit larceny, and he (defendant) has the felonious intent of stealing the property and converting it to his own use, the act of the other party and the intention of the defendant must be brought together, and the commission of the act treated as though it were executed by the defendant. And in such case the court properly refused to instruct the jury that if they found such other party had no intention of stealing the property at the time he obtained it, then neither he nor the defendant was guilty of larceny.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel G. Taylor,* Judge.

AFFIRMED.

*Thos. B. Harvey* for appellant.

(1) The property was not obtained in Illinois either by larceny or by robbery. State v. Fink, 84 S. W. 924; Rex v. Barnard, 7 Car. & P. 784; State v. Wilkerson, 98 N. C. 696; 1 Clark's Crim. Law (2 Ed.), p. 322; State v. Kube, 20 Wis. 217; State v. Anderson, 186 Mo. 25; State v. Buck, 186 Mo. 15. (2) The indictment is insufficient in failing to allege that the property was stolen in Illinois and brought into this State.

12 Ency. Pl. and Pr., 949; Lee v. State, 64 Ga. 203; Stanley v. State, 24 Ohio St. 166; State v. Reonnals, 14 La. Ann. 278; Simpson v. State, 23 Tenn. 456; State v. Matthews, 87 Tenn. 689; Morrissey v. People, 11 Mich. 327; Ham v. State, 17 Ala. 188; Le Vaul v. State, 40 Ala. 44; State v. Morales, 21 Tex. 298; Cummins v. State, 12 Tex. App. 121; Strouthnor v. Com., 92 Va. 789; Clark's Cr. Law, p. 424; May's Cr. Law, sec. 80; Beale's Cr. P. & P., sec. 5; Rapalje on Larceny, sec. 62; 14 Am. Digest, sec. 178.

*Herbert S. Hadley,* Attorney-General, and *Rush C. Lake,* Assistant Attorney-General, for the State.

(1) The question of the interest in and ownership of the property by the railroad company has been passed upon in this State in the case of State v. Waghalter, 177 Mo. 676. (2) A full discussion of the question of larceny as distinguished from obtaining money by false pretense is given in the cases of State v. Anderson, 186 Mo. 25; State v. Copeman, 186 Mo. 108; State v. Buck, 186 Mo. 15. And the law as applied to the facts in this case leaves no doubt that Mintz was guilty of larceny. There was no transfer of title from the railroad company to Rector. So far as the railroad company was concerned, he was given possession of the property for but one purpose and that was to convey it to the shoe company in St. Louis.

FOX, J.—The information in this case was filed in the circuit court of the city of St. Louis by the circuit attorney of St. Louis, on January 26, 1904, charging the defendant, Samuel Mintz, together with Alexander Zellinger, Jacob Zeidell and William Wiseman, with stealing one hundred and forty-six cases of shoes from the Cleveland, Cincinnati, Chicago & St. Louis (commonly called the "Big Four") Railroad Company, of the aggregate value of eighteen hundred dollars.

The defendant was arrested and filed a motion to quash the information, which motion was by the court overruled; the defendant was arraigned, pleaded not guilty and was placed upon his trial after a severance was granted, and the State elected to first try defendant.

The information contains two counts, and the offense was thus charged:

"Now comes Joseph W. Folk, circuit attorney within and for the Eighth Judicial Circuit of the State of Missouri, aforesaid, and upon his official oath information makes as follows:

"That Alexander Zellinger, Jacob Zeidell, Samuel Mintz and William Wiseman at the city of St. Louis aforesaid, on or about the twelfth day of September, in the year one thousand nine hundred and three, did feloniously steal, take and carry away from the possession of the Cleveland, Cincinnati, Chicago & St. Louis (commonly called the "Big Four") Railroad Company, a corporation, one hundred and forty-six cases and one thousand seven hundred and ninety-nine pairs of shoes contained in said cases, all of the aggregate value of eighteen hundred dollars, and all the goods and personal property of the said Cleveland, Cincinnati, Chicago & St. Louis Railroad Company, with the intent then and there feloniously to deprive the owner of the said goods and personal property of the use thereof, and to convert the same to their own use, without the consent of the owner; against the peace and dignity of the State.

"And the said Joseph W. Folk, circuit attorney within and for the Eighth Judicial Circuit of the State of Missouri, aforesaid, upon his official oath aforesaid, further information makes, as follows:

"That Alexander Zellinger, Jacob Zeidell, Samuel Mintz and William Wiseman, at the city of St. Louis, aforesaid, on or about the twelfth day of September in the year one thousand nine hundred and three, did fel-

State v. Mintz.

oniously and fraudulently buy, receive, have and take into their possession one hundred and forty-six cases and one thousand seven hundred and ninety-nine pairs of shoes, contained in said cases, all of the aggregate value of eighteen hundred dollars, and all the goods and personal property of the Cleveland, Cincinnati, Chicago & St. Louis (commonly called the "Big Four") Railroad Company, a corporation, which said goods and personal property had then lately before been feloniously stolen, taken and carried away from the possession of the said Cleveland, Cincinnati, Chicago & St. Louis Railroad Company; they, the said Alexander Zellinger, Jacob Zeidell, Samuel Mintz and William Wiseman, then and there well knowing the said goods and personal property to have been so feloniously stolen, taken and carried away, as aforesaid; with the intent on the part of the said Alexander Zellinger, Jacob Zeidell, Samuel Mintz and William Wiseman, then and there feloniously to deprive the owner of the said goods and personal property of the use thereof and to convert the same to their own use, without the consent of the owner; against the peace and dignity of the State.

"Jos. W. Folk,<br>"Circuit Attorney.

"State of Missouri, }<br>"City of St. Louis. } ss.

"Being duly sworn upon his oath says, that the statements contained in the foregoing information are true.

"William Cassen.

"Sworn to and subscribed before me this 25th day of January, A. D. 1904.

"Casper J. Wolf,

"Clerk of the circuit court, city of St. Louis, for criminal causes."

The evidence developed at the trial of this cause substantially shows the following state of facts:

The freight depot of the Big Four Railroad for the reception and delivery of freight for the city of St. Louis, Missouri, is situated in the city of East St. Louis, Illinois, and it is the custom of merchants in St. Louis to give the work of hauling goods from this and other railroads to transfer companies which contract to haul freight for the merchants from East St. Louis to St. Louis, crossing the river by bridge or ferry, as the case may be.

On or about the 10th or 11th day of September, 1903, there was received, among other freight, at the Big Four depot, one hundred and forty-six cases of shoes consigned to the Geisecke-D'Oench-Hays Shoe Company, a firm of merchants in the city of St. Louis. It appears that in the course of business of the Big Four Company, the freight received for delivery is checked out of the cars on what is called a "blind tally," that is, the "checker" takes a blank sheet provided and as the goods come out of the car enters the items on the "blind tally," and this "blind tally" is turned over to other employees and by them checked against the waybills to ascertain the correctness of the list of goods. From the waybills are then prepared delivery tickets, giving the name of the consignor and consignee, and the location of the goods in the warehouse of the Big Four Company, so that when the goods are called for the delivery clerk will know the class and character of the goods called for and their location in the warehouse.

A person calling for goods is referred to the delivery clerk, who refers to his delivery tickets and turns the tickets over to a person known as a "picker." The "picker" directs the party to whom the goods are to be delivered to place his wagon in front of the door nearest to the location, and the goods are

by him delivered to the wagon, and the driver signs the delivery tickets and is given a ticket to be signed by the consignee, which is to be returned to the railroad company when signed by the consignee. The testimony shows that the Mound City Transfer Company had been doing all the hauling for the Giesecke Company for several years and that fact was well known and so understood at the Big Four depot. Clarence Rector, who procured the goods, had for about a year or more previous to August 12, 1903, been an employee and driver for the Mound City Transfer Company, and had made almost daily visits to the Big Four depot in such capacity, and was well known to the delivery clerks as a Mound City employee. On Saturday morning, September 12, 1903, about seven o'clock or a little after, Rector drove up to the depot and there met Robert Morcom, one of the delivery clerks of the Big Four.

On that morning there was what was known as a "rush order" in the Big Four depot for the delivery of a box of brass faucets for the Blanke Company, a concern for which the Mound City Transfer Company also did the hauling, and when Rector appeared Morcom proceeded to make up a load of freight for him to be hauled by the Mound City Transfer Company.

Morcom produced the delivery tickets for the Blanke orders and for the Giesecke order and handed them to Cassen, a "picker," and told him to give the goods called for by the tickets. As to the custom of delivery Morcom testified that when a man came in, whether an employee of the Mound City Transfer Company or any other, and asked for a load he would turn the sheets over to his men and instruct them how to load the wagon. On this morning when Rector called for one particular shipment of shoes, he had a rush order from Blanke for one box of brass faucets, and told him he would have to take those goods, then he would deliver him the shoes.

W. O. Life, a witness for the State, testified that on September 12, 1903, he worked for the Big Four Company and was a partner with Morcom, both delivery clerks at the same window, and that Rector came to the window and said he wanted a load of shoes, and that when he told him he could not get the load of shoes without taking the box of brass, he said he would not take the box of brass, had not time enough to go after that. He again told him he would have to take the box of brass or he would not get the shoes, to which Rector replied: ''I have got to hurry, I have got to reach a car of the Missouri Pacific.'' Life then told him that it didn't make any difference what he had to do, he would have to take the box of faucets or he would not get the shoes. Life further testified that the Mound City company did the hauling for the Giesecke company and that he knew Rector as an employee of said transfer company.

The testimony of other employees of the Big Four company shows that they knew Rector was a driver for the Mound City company and that the box of brass for Blanke and the shoes for Giesecke were delivered to Rector in the regular course of business; that the steps taken by them were such as are taken in the usual course of business when dealing with the delivery of freight; that it was the custom of the transfer company to give the number of the wagon hauling the goods; that Rector gave the number of his wagon as 105. That number was given by Rector, who accounted for his wagon not being the regular wagon of the Mound City company by stating that his regular wagon had broken down.

It appears from the evidence that the Giesecke company have all the cases, in which shoes are manufactured for them, marked with what is known as the ''Key Brand.''

Rector testified that prior to about the 12th day of August, 1903, he was employed by the Mount City

Transfer Company of St. Louis; that from about that date to September 12, 1903, he was unemployed; that he had known Sam Mintz for perhaps a month before September 12th, and that on September 11, 1903, he met Mintz in a saloon in St. Louis by pre-arrangement and that Mintz hired him to drive a team for him the next day, also promising future employment; that early on the morning of September 12, 1903, and about 5 a. m., he went to Mintz's house in St. Louis and Mintz by agreement had a team brought around and hitched to a stake wagon and told Rector to go to the Big Four depot and get a load of shoes, saying to him, "Just call for a load of shoes and you will get them." Mintz accompanied Rector a part of the way on foot, toward the bridge, and then turned the team over to him and Rector drove over the bridge, Mintz having told him to get the shoes and that a young fellow who had brought the team would tell Rector where to deliver the shoes. Mintz again met Rector at the end of the bridge, bought him several drinks, again told him what to call for at the Big Four depot, and told him about the young fellow, and Rector proceeded to the depot with his team and wagon. The details of what happened at the depot as shown by the evidence of the Big Four employees is corroborated by Rector, who testified as follows, as to what happened after the team was turned over to him by Mintz and he started from St. Louis for the Big Four depot in East St. Louis:

"Q. What occurred then? A. He told me he would meet me the other side of the river. I didn't see Sam Mintz there, so I went on across; there was an old fellow gets on the wagon with me, I don't know his name; he asked me to ride across; I told him all right. He rode across the bridge to the stairs on the far side, the old fellow did, and and he gets off and walks down the stairs—he works at the Big Four, I think. After I passed the stairs Sam Mintz got over, he overhauled the wagon, rode about half way down the entrance to

the bridge. Q. Was that the first time you saw him? A. Since I left the saloon, yes, sir. So Sam gets on there and he says, 'You drive down to the Big Four, back into door No. 8 and ask for a load of shoes,' and he says, 'You will get them.' I told him all right. As he got off the wagon he said: 'Stop down at the corner and sweep the coal dust off;' there was some coal on the wagon. I drove down there, went to the saloon, got a broom, and by that time Sam was there too. Sam went in the saloon before we swept the wagon, had a couple of drinks; I went out and swept the wagon off, came back and had a couple more; I was feeling pretty good then. So I drove down to door No. 8, backed in, met the foreman or delivering clerk; I said, 'I am after a load of shoes.' He said, 'where is your wagon?' I said 'No. 8 door;' he said, 'They are just opposite here;' I said 'All right;' he said, 'There is a box of faucets to go over with that load.' I said, 'I ain't sent for no faucets.' He said, 'You have got to take them, that settles it.' So we commenced loading shoes and he brought the faucets out and says: 'Take this box and load it first;' I said, 'I will not do it.' He said, 'You have got to take that now, that settles it.' So he put these men to loading my wagon, three truckers, three pickers, piled the shoes out faster than I could load up. Finally I got loaded up. He wanted me to sign two tickets—three tickets rather, and Mintz told me on the bridge to sign the name 'Reed,' not to sign my name for the shoes, but I supposed it to be all right; so I signed that box of faucets in the name of Reed; signed the whole business. Q. Was there anything said about the wagon? A. Yes, they asked what was the number of my wagon—they always do that, that is customary—I told them 105. Sam told me that was his number, the wagon goes by that number, that the other wagon was broken down.''

After driving from the Big Four depot, Rector and the young man who Mintz told him would be his

guide, crossed the ferry with him and finally they drove to Zellinger's place at 2620 Franklin avenue, where all of the shoes were deposited. Zellinger protested about taking all the one hundred and forty-six cases until Mintz told him they would take them away on Monday. Zellinger testified that the young man, whose name he does not know, told him to walk down the street and see Mintz, which he did, and then it was arranged that Zellinger take all the shoes.

Rector testified that after the shoes and the brass faucets were unloaded the team and wagon were turned over to the young man, and that he met Mintz who gave him twenty-five dollars for his day's work. That subsequently Mintz gave him other money, trying to get Rector to agree to run away; that Mintz kept promising to give him enough money so he could leave the country, but he failed to produce the agreed amount and finally Rector was arrested on or about 17th of September.

The testimony shows that one Zeidell was sent for to buy part of the shoes, and that on Saturday evening, the day the shoes were placed in Zellinger's store, Zellinger gave Zeidell $100 which was turned over that same evening to Mintz. On Sunday, Zeidell testified, he was sent for and told to get ordinary dry goods boxes and pack the shoes in. That he and Zellinger, Zellinger's clerk and the young man who brought the shoes on Saturday opened the cases and packed the shoes, or rather dumped then in large dry goods boxes. That while they were at work at this, $156 worth, or what was sold to one Volker for that amount, were packed up and sent to this man, said to be from Texas. Defendant was present when the goods were repacked, and during the time the sale was being made to the merchant from Texas. That on Monday seven dry goods boxes of these shoes were loaded on an express wagon and taken to 7616 South Broadway to the home of a man by the name of Isaac Seifer, and put in a shed

in the rear of his house, where they remained until Friday of that week, when they were taken away by the police to the Four Courts.

The testimony of the police officers shows that two or three of the original cases were found in Zellinger's place; that in his basement or cellar were found broken boxes with the "Key Brand," showing that they were boxes in which Giesecke shoes had been shipped, and Zellinger testified that the shoes produced in court were like the ones delivered to him by the young man, and which Mintz told him to take.

Zellinger testified that Mintz told him to make the sale to Volker for $156, and that on Monday night Mintz asked Zellinger to give him what money he had, and that he gave Mintz $90.

On or about Thursday of that week the arrests were made and the shoes recovered. The identification of the shoes was complete, not only from the testimony of the witnesses, but from the invoice sent by the factory which made them, when compared with the shoes themselves.

At the close of the evidence for the State, the defendant asked an instruction in the nature of a demurrer, which the court refused.

Thereupon, the defendant rested his case and the State dismissed as to the second count of the information.

At the close of all the evidence the court instructed the jury fully covering every feature of the case to which the testimony was applicable. The case was submitted to the jury and they returned a verdict of guilty assessing his punishment at imprisonment in the penitentiary for a term of three years.

Sentence and judgment was entered in accordance with the verdict, from which judgment the defendant prosecuted this appeal, and the cause is now before us for review.

State v. Mintz.

OPINION.

The record in this case presents three legal propositions for consideration:

1. It is insisted that the testimony in this cause does not establish a larceny of the property in the sister State, but simply shows the obtaining of goods under false pretenses, and therefore defendant's offense does not fall within that provision of section 2362, Revised Statutes 1899; hence, he was improperly convicted under that section.

2. That the indictment upon which this prosecution is predicated is insufficient by reason of the omission of any allegation charging that the property was stolen in the State of Illinois and brought to this State.

3. The correctness of the instructions given by the court are challenged, and error is also assigned upon the refusal of the court to give instructions requested by defendant.

Section 2362, Revised Statutes 1899, upon which this prosecution is based, provides: "Every person who shall steal, or obtain by robbery, the property of another in any other State or country, and shall bring the same into this State, may be convicted and punished for larceny in the same manner as if such property had been feloniously stolen or taken in this State, and in any such case the larceny may be charged to have been committed, and every person may be indicted and punished, in any county into or through which such stolen property shall have been brought."

At the very inception of the consideration of the proposition presented to us for solution, it is not inappropriate to say that learned counsel for appellant has said everything that can be urged in support of the contentions presented.

It must be conceded that it is essential, to constitute the offense denounced by the statute, that the property in the sister State must be stolen or obtained

by robbery. It is clear that the facts developed at the trial do not show that the property was obtained by robbery—none of the essential elements of that offense are present according to the testimony offered; hence, that brings us to the consideration of the first proposition as to whether or not the evidence developed at the trial established the obtaining of the property by larceny, as contemplated by the statute.

It is insisted by appellant that the proof in this case is insufficient to establish larceny; hence, that if it shows anything, it was the obtaining of property under false pretenses. The distinction between larceny and obtaining goods under false pretenses was carefully marked in the recent cases of State v. Anderson, 186 Mo. 25; State v. Buck, 186 Mo. 15; and State v. Copeman, 186 Mo. 108. A fair and reasonable application of the rule announced in those cases must furnish the solution of the first proposition presented in this case.

As applicable to this first proposition the facts are undisputed and may thus be briefly stated: Rector, who obtained the goods from the railroad company, had been for a long time in the employ of the transfer company that usually received and delivered the freight from the Big Four depot consigned to Giesecke-D'Oench-Hays Shoe Company. There was little or no conversation between the employees of the railroad company and Rector in respect to getting the cases of shoes; Rector made no representation and it is apparent that, he having formerly worked for the transfer company, it was simply taken for granted that he was authorized to receive the goods for the purpose of delivery to the shoe company in the city of St. Louis, and the goods were delivered to him under those circumstances.

It is insisted that Rector having been previously engaged as a driver for the transfer company which was authorized to receive and deliver goods to the shoe

State v. Mintz.

company, his appearing at the depot of the railroad company in his usual way, with the wagon calling for the cases of shoes charged to have been stolen, and the delivery of the goods to him under the circumstances, constitutes the offense of obtaining the cases of shoes in controversy under false pretenses, not by larceny. In other words, that while there was no express representations or pretenses made to secure the delivery of the goods, yet, considering all the circumstances which resulted in the obtaining of the goods, it amounts to a pretense or false representation that he was still a driver for the transfer company, with full authority to receive freight for the shoe company, when in fact such pretense was false, and he had no such authority.

It is unnecessary to express an opinion upon the correctness or incorrectness of this insistence by the appellant. Courts of high standing have treated conduct similar to that of Rector as amounting to the practice of false pretenses. This contention may be conceded, and still we are quite distant from the solution of the vital and overshadowing question as to whether the defendant, under the facts disclosed at the trial, was guilty of larceny or obtaining goods under false pretenses.

The railroad company was in possession of the property charged to have been stolen, and this possession constitutes a sufficient ownership as against the wrongdoer. [State v. Waghalter, 177 Mo. 676; 3 Greenleaf's Evidence (16 Ed.), sec 161.]

In State v. Anderson, and State v. Buck, supra, the distinction between the offenses of obtaining goods under false pretenses and larceny has been clearly drawn. It can serve no useful purpose, nor can it add anything to the legal literature, to burden this opinion with a repetition of what was said in those cases; hence, we must be content with a simple reference to the general rules marking the distinction in those two

offenses as announced in the adjudications which have met the approval of this court.

The authorities uniformly recognize the narrow margin between a case of larceny and where the property has been obtained by false pretenses and fully appreciate the nicety as well as the importance of the distinction.

In the treatment of the distinction between larceny and obtaining property under false pretenses, the authorities employ different terms in giving expression to the rules governing the distinction, but the same conclusion is reached and the general rule is now settled and fully recognized that where property is delivered with the intention of parting with it altogether; that is, by giving the title as well as the possession, the offense is that of false pretenses. On the other hand, if the possession is parted with, and not the right of property, the offense is that of larceny. In Commonwealth v. Barry, 124 Mass. 325, the rule is thus briefly stated: "If the possession is fraudulently obtained, with intent on the part of the person obtaining it at the time he receives it, to convert the same to his own use, and the person parting with it intends to part with his possession merely, and not with his title to the property, the offense is larceny." In Murphy v. People, 104 Ill. 528, the same rule is announced, with a mere change of expression. It was said: "If the owner of the goods alleged to have been stolen parts with both the possession and the title to the goods to the alleged thief, then neither the taking nor the conversion is felonious. It can but amount to fraud. It is obtaining goods under false pretenses." To the same effect is People v. Morse, 99 N. Y. 662; Stinson v. People, 43 Ill. 397; 2 Arch. Crim. Prac. & Plead., 372; 2 Clark & Marshall, Crimes, 710.

It will be observed that all of those cases are fully discussed in the recent cases of State v. Anderson, and State v. Buck, in which the rule as announced fully

met the approval of this court.    In Murphy v. People, 104 Ill. and Stinson v. People, 43 Ill. supra, the further distinction was made between these two offenses, that where "the owner parts with the possession voluntarily, but does not part with the title, expecting and intending that the same thing shall be returned to him, or that it shall be disposed of on his account, or in a particular way, as directed or agreed upon, for his benefit, then the goods may be feloniously converted by the bailee, so as to relate back and make the taking and conversion a larceny."

It is ably and earnestly urged by counsel for appellant that, under the line of authorities as indicated, the facts developed in this case simply constitute the offense of obtaining property under false pretenses. We are unable to give our assent to this contention. It is urged by appellant that the railroad company had a special property in the goods delivered to Rector and that in delivering the goods to him it surrendered its entire title or special ownership, and hence the case should fall within the rule of the cases herein referred to, that where an owner voluntarily parts with his title to the property, and not simply the possession, the offense is that of false pretenses.    In our opinion the argument of counsel for appellant is predicated upon an erroneous conception of the relation of the railroad company and Rector to the property charged to have been stolen.    While it may be said that the railroad company had such a special interest in this property as to make the stealing from it larceny, yet their dominion over the property was far from being absolute.    The railroad company is a common carrier; they had carried these goods to their place of destination and had the possession of them for a limited purpose—that was the delivery to the consignee or his authorized agent.    The appearance of Rector, who had formerly been in the employ of the transfer company, in his usual way with his wagon,

upon the theory of the defense, must be treated as a representation or pretense that he was authorized to receive the goods of the shoe company. Upon this representation the delivery was made, but it was made for a special purpose, and upon an implied understanding that he would deliver the goods to the shoe company. It is clear under the facts in this case that the railroad company did not pass any title to this property, but they merely delivered the possession of these goods for a particular purpose. The dominion of the railroad company over this property was by no means absolute. They were simply entrusted with the custody of the property for a particular purpose. Its delivery of the possession of the property to Rector was accompanied with the implied condition or understanding that such possession was delivered for the purpose of the delivery of the goods to the shoe company.

There is a well-recognized distinction between obtaining possession of property from the absolute owner by false and fraudulent representations and the obtaining of property from other persons who simply have the custody and possession of the property as the agent or servant of the owner. Mr. Greenleaf in treating of this subject makes clear this distinction. In discussing this proposition he says: "A felonious intent may be proved by evidence that the goods were obtained from the owner by stratagem, artifice or fraud. But here an important distinction is to be observed between the crime of larceny, and that of obtaining goods by false pretenses. For supposing that the fraudulent means used by the prisoner to obtain possession of the goods were the same in two separate cases, but in the one case the owner intended to part with his property absolutely, and to convey it to the prisoner, but in the other he intended only to part with the temporary possession for a limited and specific purpose, retaining the ownership in himself; the latter case alone would amount to the crime of larceny, the former constitut-

ing only the offense of obtaining goods by false pretenses. Thus, obtaining a loan of silver money, in exchange for gold coins to be sent to the lender immediately, but which the prisoner had not, and did not intend to procure and send, was held no felony, but a misdemeanor; and so it was held, where the prisoner obtained the loan of money by means of a letter written by himself in the name of another person known to the lender. But where the goods were obtained from the owner's servant, the prisoner falsely pretending that he was the person to whom the servant was directed to deliver them, it was held to be larceny. For in the two former cases, the owner intended to part with his money; but in the latter case, the taking from the servant was tortious, he having only the care and custody of the goods for a special purpose." [3 Greenleaf's Ev. (16 Ed.), sec. 160.]

Mr. Wharton, in his recognized standard work upon Criminal Law, fully demonstrates this proposition. He said in his text: "Suppose A. goes to B. and says, 'I am C., sell me these goods,' and B. delivers the goods to A., believing A. to be C., this being an essential incident of the contract; does any property pass to A.? The better view is in the negative, there being no contract between A. and B. If this be correct, then it is larceny in A. to take goods on this false personation; though there are authorities to the effect that the case is not larceny but false pretenses. If the pretense be, not false personation, but false statement of means, then, as there is a contract of sale, the case is false pretense and not larceny. And where A. says, 'I am sent by C. to carry the goods to him,' which is false; and thus obtains only possession of the goods; this is larceny in cases in which B. intends to part only with the possession of the goods to A. But here we encounter a subordinate distinction. Suppose A., pretending to be C., goes to B. and fraudulently obtains from B. certain goods of C., which are in B.'s hands as bailee. Is

this larceny? It certainly is, because B. has no intention of passing the property in the goods to A.; or to any one; he (B.) considering himself to have no property in the goods to pass. This distinction has been vindicated in Massachusetts in the following case: 'Sanderson had left his watch at a watchmaker's to be repaired, and the defendant went to the shop, pretending to be Sanderson, asked for the watch, paid for the repairing, and took the watch with a felonious intent.' 'These acts,' said CHAPMAN, J., 'constitute larceny at common law. The case is like that of Rex v. Longstreeth, 1 Mood. C. C. 137. The defendant in that case went to a carrier's servant, and obtained from him a parcel by falsely pretending to be the person to whom it was directed. It was held to be a larceny, because the servant had no authority to deliver it to him, so that no property passed to him, but the mere possession feloniously obtained. So in this case the watchmaker had no authority to deliver the watch to the defendant, and the latter obtained no property in it, not even the qualified property of a bailee, but a mere felonious possession, which is the essence of the crime of larceny.' "' [Wharton's Crim. Law (10 Ed.), sec. 888, and cases cited.]

In Harris v. State, 81 Ga. 758, the rule is clearly and correctly announced as to the delivery of possession for a particular purpose. The Supreme Court of Georgia in discussing the Harris case which, in some of its features, is very similar to the case at bar, thus stated the law: "The rule is, that 'if one, meaning to steal another's goods, fraudulently prevails on the latter to deliver them to him, under the understanding that the property in them is to pass, he commits neither larceny nor any other crime by the taking, unless the transaction amounts to an indictable cheat. But if, with the like intent, he fraudulently gets leave to take possession only, and takes and converts the whole to himself, he becomes guilty of larceny; because, while

his intent is thus to appropriate the property, the consent which he fraudulently obtained covers no more than the possession.' [1 Bishop's Crim. Law, sec. 583, and authorities there cited.] In this case, Harris fraudulently represented to High & Ryan's Sons that he was the agent of Moore & Marsh. They did not sell him the goods, nor did they intend the title to go into Harris; but they simply delivered him the custody of the goods, to be delivered by him to Moore & Marsh. He having converted the proceeds of the sale of the boxes to his own use, he was guilty of larceny. The title still remained in the vendor. Harris got the custody of the goods wrongfully and fraudulently.''

In State v. Lindenthall, 5 Rich. L. R. (S. C.) 237, it was ruled that a person who obtained the possession of goods by consent of the owner for one purpose, such as hiring or carrying, with the intent to steal, and consummated that intention partly or entirely by converting the goods to his own use, is beyond doubt guilty of larceny.

In the case at bar Rector obtained the goods from the railroad company for a particular purpose, that of delivery to the shoe company; he acquired no sort of title or ownership to the property, but a mere bare possession. The authority of the railroad company in respect to the goods in dispute was limited; they were only authorized to deliver the possession to the consignee or its authorized agents.

In support of the contention by appellant we are cited to the case of State v. Kube, 20 Wis. 217. The facts in that case somewhat distinguish it from the case at bar. In that case an express agent had a package for Christiana Kube; John L. Kube, her husband, claimed the package for his wife and by false representations induced the agent to believe that a mistake was made in the address of the package and thereby secured the absolute delivery of it to him for his wife. It will be observed that the delivery to the defendant,.

John Kube, for his wife, was absolute, not coupled with any conditions or implied contract that he would deliver the package to the true owner. Neither the defendant nor his wife were the owners of the package, but the agent parted absolutely with the package, believing that defendant's wife was the owner of it and that he had delivered it to the proper person. The offense in that case consisted of false representations as to the true owner of the package and the absolute dominion over the property was thereby obtained. In the case at bar the offense consisted of obtaining possession of the property for a particular purpose, that of delivery to the true owner, the shoe company. It may be said that the railroad company thought and believed that it was delivering the goods to a person who was authorized to receive it, and no doubt that was true, but the delivery by the railroad company to Rector was not intended to grant to him absolute dominion over the property, but was limited to a particular purpose, that of delivery to the shoe company, who was known to the railroad company as the owner of the property. In other words, embodying one of the illustrations of Wharton, Rector says, "I am sent by the shoe company to get its goods," which was false, and thus obtained only possession of the goods for the purpose of delivering them to the shoe company; that is larceny, for the reason that the railroad company was only authorized and only intended to deliver a bare possession for the purpose of having the goods delivered to the consignee.

This brings us to the consideration of the second proposition, that the indictment is insufficient to support the judgment of conviction. This contention is predicated upon the failure of the indictment to charge that the property was stolen in Illinois and brought into this State. Section 2362 expressly provides: "In any such case the larceny may be charged to have been

committed, and every such person may be indicted and punished, in any county into or through which such stolen property shall have been brought.'' If the allegations contended for by appellant, "that the property was stolen in Illinois and brought into this State," are essential to the validity of an indictment or information for such offense, it must necessarily follow that the provision of the statute which authorizes the charging of the larceny to have been committed in any county into or through which such stolen property shall have been brought, is void and of no effect. The statute, substantially, upon which the charge in this cause is based was enacted by the Legislature at a very early period in the history of this State.

This court at a very early period of its organization had in judgment the validity of this statute in the case of Hemmaker v. State, 12 Mo. 453. NAPTON, J., in that case, after reviewing a number of causes in other jurisdictions, in which it was held that offenses of this character committed in other States or foreign countries were not cognizable in the courts of the State to which the property had been brought, said: ''We are not under the necessity of deciding the question which these cases present. Our statue was obviously intended to punish offenses committed against our criminal laws, and not those which were commited without jurisdiction of the State. If the Legislature think it expedient to declare that a person who is guilty of grand larceny in another State or country and brings within our jurisdiction the stolen goods, shall be considered as guilty of grand larceny, here, it is clearly within their constitutional power to make such enactment. In the determination of the character of the offense there is no necessity for inquiring what may be larceny under the laws of the country where the offense was committed. The Legislature punishes the offense committed in this State by bringing the stolen property into it, and in doing so, they merely cod-

ify a settled principle of the common law applicable to different countries, and extend it here to neighboring States and foreign countries. The case of People v. Burke (11 Wend. 129), is an authority in point upon a statute exactly like our own.''

In State v. Williams, 35 Mo. l. c. 232 and 233, this court again made reference to this statute and very briefly thus stated its conclusions: ''Whether the crime of larceny committed in one State can be transplanted with the goods into another State, so as to become an offense against and punishable in the latter State, is a mooted question, and has given rise to many conflicting opinions; but no such question can arise in this case, for it is expressly authorized by the 3d sec. of the 9th art. of our act relating to crimes and punishments (R. S. 1855, p. 637).''

Again, in State v. Butler, 67 Mo. 59, the validity of this statute was called in question and its validity was maintained, and the conclusion as reached in the case of Hemmaker v. State, supra, was fully approved. In all three of these cases in which there was a conviction by the trial court the judgments were affirmed, and we have the original records now before us, and in none of them do the allegations contended for by appellant, that the property was stolen in another State and brought into this State, appear in the indictment.

In the disposition of this proposition we might be content by simply announcing that the cases to which we refer must be treated as decisive of the question now under discussion; however, it may be further said that in State v. Butler, supra, the case of People v. Williams, 24 Mich. 156, is cited with approval, and gives full support to the correctness of the conclusions announced by this court upon this statute. The provisions of the Michigan statute upon this subject were substantially the same as ours. Judge COOLEY, in that case, responding to the challenge to the validity of the

statute, in an able, clear and exhaustive discussion of the proposition, fully met and answered every contention urged against it. After a careful and logical discussion of the purposes of the statute, and fully stating the broad grounds upon which its validity should be maintained, the learned and distinguished jurist then sums up his conclusions upon the question in judgment before him. He said: "Now it may be true that this wrong would not have been an offense within this State at the common law; but that does not prevent its being made so by statute. Many trespasses upon individual rights are made punishable because the interest society has in suppressing such disorders, is such that they may properly be treated as offenses against society. The present is a case of trespass upon private right begun, indeed, in another State, but continued into our own, and which the paramount law of the land requires that we should see righted on demand of the party aggrieved. The persistence in the wrong here, then, as against the right of one whom the State is bound to protect to the full extent that it must protect one of its own citizens, is not only not a matter of indifference to the State, but is a flagrant contempt of its authority, and it is eminently proper that the State should treat it as a crime, if in the opinion of the Legislature, the peace and good order of the State demand its punishment. That such is its opinion, is proved by the statute in question." Whatever doubts may have been entertained as to the validity of this statute, they are certainly removed by the clear and able discussion of the proposition by Judge COOLEY.

It is very earnestly urged and ably presented that the failure to charge in the indictment that the property was stolen in Illinois and brought to this State is misleading to the defendant and does not comply with the provision of the Constitution which guarantees to him the right to know the nature and character of the charge preferred against him. In response to this argument

it is sufficient to say that when a defendant is charged with stealing property, and the property is described, even though it does not aver the particular place of the stealing other than the county or city in this State to which the property is brought, this seems to us as rather a full notification of the nature and character of the charge, and is amply sufficient to require the defendant, in order to meet such a charge, to summon to his aid proof of every nature and character in whatever State it may be found, to rebut such charge, and if in possession of the property, to show that such possession was honestly acquired. We see no legal reason for overturning the results of the cases heretofore referred to, which were decided by this court upon indictments similar in form to the one in the case at bar.

This brings us to the only remaining proposition presented to our consideration, that is, the refusal of the court to instruct the jury that if ''they believe and find from the evidence that the witness Rector had no intention to take, steal and carry away the property when he obtained it, then he was not guilty of larceny, nor was the defendant guilty of larceny.''

Upon the facts developed at the trial of this case we have reached the conclusion that there was no error in the refusal of this request. The testimony as introduced by the State is undisputed that the witness Rector was the instrument selected by the defendant to accomplish his fraudulent and felonious intent of stealing the property as charged in the information and permanently depriving the owner of it. He furnished the wagon; directed Rector how to proceed in order to obtain this property, and upon the testimony, as disclosed by the record, the felonious intent and design entertained by the defendant in this case is made too clear for discussion. Whatever was done by Rector must be treated as the act of this defendant, and even though Rector's mind was inactive and he was ignorant of the purposes of his act, if defendant Mintz di-

rected the act to be done, and had the felonious intent of stealing the property and converting it to his own use, through the act of his instrument, Rector, then the act of Rector and the intention of the defendant Mintz should be brought together, and the commission of the act must be treated as though it was executed by the defendant, who directed it. In other words, if defendant Mintz entertained the felonious intent and design of stealing this property and directed Rector to do such acts as would result in obtaining the property, without informing Rector as to his intent, and by reason of the commission of the act by Rector the property is obtained and converted by the defendant Mintz, to his own use, we are unwilling to say that this would not constitute larceny on the part of the defendant Mintz. If Rector had no design or intent to steal the property obtained by him, at the time of taking such property, and he was simply, as claimed by appellant, carrying out the purposes of the defendant Mintz, without any information as to what Mintz's purposes were, then there is no difference in principle in the use of Rector by the defendant as an instrument to remove the property from the possession of the owner, and in using any inanimate instrument in reaching out, such as tongs, pinchers or other instruments to remove the property sought to be stolen from its location. The defendant Mintz having directed Rector in the commission of the act of taking the property, it must be held that the intent of defendant Mintz accompanied Rector in the commission of such act.

We have carefully considered the instructions given by the court upon which this cause was submitted to the jury. They fully cover every feature of this case to which the testimony was applicable, and finding no reversible error upon the record, as presented, the judgment of the trial court should be affirmed, and it is so ordered.

*Gantt, J.,* concurs; *Burgess, P. J.,* absent.