[L. A. No. 1820.  Department One.—July 2, 1907.]

## NEW LIVERPOOL SALT COMPANY, Appellant, v. WESTERN SALT COMPANY, Respondent.

Bailment—Sale—Possession Left with Seller—Duty of Bailee—Conversion.—Where personal property sold is by the contract of sale left in the possession of the seller as a depositary he becomes a bailee for the purchaser, and as such it is his duty to keep the property safely and deliver it to the bailor or his successors in interest on demand; and neither the wrongful conversion of the property to his own use by the bailee nor his wrongful transfer of the possession thereof to another can divest the title of the true owner.

Id.—Title Remains in Bailor after Conversion—Sale by Bailor.— After the wrongful conversion by the bailee of the thing bailed, the title thereto remaining in the owner is a species of property, and as such is subject to sale and transfer by the owner; and a sale by the owner of the entire property bailed, which described a portion thereof converted by the bailee, as well as that remaining in his possession, was in effect a transfer of the title to all the property wherever situated, and notwithstanding its previous removal by the bailee.

Id.—Right of Action against Bailee—Claim and Delivery.—A purchaser of the property bailed who became entitled to its immediate possession at the time of the purchase, and who has complied with the conditions of the contract of bailment, upon demand for possession being made and refused, became vested as against the bailee with a right of action for its possession, or for its value, if possession could not be recovered; and the fact that the bailee, before the demand, or before the action was begun, had parted with the possession of the property is no defense to such action. Nor would the fact that the plaintiff in such action was the vendee of the original bailor affect the case in this particular.

Id.—Non-Payment of Purchase Price—Forfeiture of Sale.—In such an action by the purchaser from the original bailor against the bailee the latter cannot take advantage of a provision in the contract of sale to the plaintiff providing for the reversion of the title to

the thing sold to the seller upon non-payment of the purchase price, in the absence of a showing that the seller had taken some action to enforce such forfeiture.

ID.—FORFEITURE NOT FAVORED.—A contract should not•be construed to provide a forfeiture, unless no other interpretation is reasonably possible.

ID.—CONSTRUCTION OF CONTRACT.—Considering all the provisions of the contract of sale in question, together with the surrounding circumstances, it is held that the provision for a forfeiture upon failure to make any payment specified in the contract referred only to those sums which constituted the part of the purchase price payable in money, and which might become due before delivery, and not to the charge for sewing, sacking, and delivery of the property sold, which was not to be paid until after the delivery; and that the trial court was justified in construing the contract literally, as being a sale of certain salt on hand at the place of sale ready for market, without special regard to its quantity.

APPEAL from a judgment of the Superior Court of San Diego County and from an order refusing a new trial. N. H. Conklin, Judge.

The facts are stated in the opinion of the court.

Purcell Rowe, C. H. Rippey, A. Haines, and J. S. Chapman, for Appellant.

Victor E. Shaw, and Titus, Wright & Creed, for Respondent.

SHAW, J.—The plaintiff appeals from the judgment and from an order denying its motion for a new trial. The action was for the possession of forty-six hundred tons of salt, or its value, if possession could not be recovered.

The salt in controversy consisted of salt sold by the Western Salt Company to another corporation, known as the Amalgamated Salt Company, by a written contract executed December 20, 1902. At the time of the sale the salt was left in the possession of the Western Salt Company, in accordance with the terms of the contract. Afterwards, on January 2, 1904, the Amalgamated Salt Company sold the salt embraced in that contract to plaintiff. The following is a statement of the material parts of the agreement of sale of December 20, 1902,

between the Western Salt Company and the Amalgamated Salt Company.

The Western Salt Company, which was the party of the first part, thereby sold to the Amalgamated Salt Company "all salt now owned by the party of the first part which is now lifted from the vats, sacked and stored in piles, bins and warehouses on the premises of the party of the first part," at the head of the bay of San Diego. The buyer agreed to pay for this salt eight thousand dollars of its capital stock, to be transferred to the Western Salt Company, and in addition thereto, as follows:

"Twenty-three hundred dollars ($2,300.00) on or before January 13, 1903, and the further sum of thirty-four hundred and fifty dollars ($3,450.00) on or before the 13th day of April, 1903.

"And the party of the second part further agrees to pay to the party of the first part twenty-five cents (25) per ton, on the 13th of each month for the salt delivered by the party of the first part and taken by the party of the second part in the preceding month, said twenty-five cents' per ton to represent the sewing, sacking and delivery of said salt on board cars at the works of the party of the first part on said premises; . . . providing, however, that the party of the second part agrees to further pay to the party of the first part on or before January 1, 1904, the further sum of eleven hundred and fifty dollars ($1,150.00), after deducting from said sum the amount which the party of the second part may have paid under the provision in this contract for the payment of twenty-five cents per ton upon the 13th of each month for sewing, sacking and delivery of said salt.

"It is further understood and agreed, that said party of the second part has the right to the immediate possession of said salt, and that it shall be lawful for said party of the second part, its agents and employees, to enter any premises on which said salt may be stored, or such other places as said salt is, or may be stored, and take and carry away said salt, and to occupy and use so much of any place where said salt may be stored so far as is necessary for use for such purpose while preparing said salt for transportation, without any charge therefor by way of rental or otherwise, but nothing in this clause shall be a waiver on the part of the party of the first part to the compensation as hereinbefore agreed upon.

"The title to said salt is hereby vested in the party of the second part, and it is further agreed between the parties hereto that in case any of the payments aforesaid shall not be made as above specified, then the title to said salt shall revert to the party of the first part, and it shall have the right to sell the same for the amount due it under this agreement, and no salt shall be removed from said premises by the party of the second part until said sums, amounting to $5,750.00, shall be paid."

1. The findings are that the salt on the premises on December 20, 1902, at the time of the sale to the Amalgamated Salt Company, amounted to only 1,788 tons; that after that date, and prior to the sale to the plaintiff in January, 1904, the defendant had sold, shipped, and converted to its own use 963 tons of the said salt, leaving only 825 tons remaining on the premises at the time of the latter sale. The court concluded that the effect of the agreement by which the salt was sold to plaintiff in 1904 was that the plaintiff thereby acquired title only to the salt then remaining upon the premises,—that is, to the 825 tons aforesaid. In this we think the court was in error. The contract of sale in 1904, by its terms, purports to sell to the plaintiff "all that certain salt, 4,600 tons or more, which said salt was purchased by the party of the first part (Amalgamated Salt Company) of the Western Salt Company, and is particularly described in that certain agreement made and entered into by and between the said Western Salt Company (and) the party of the first part, on the 20th day of December, 1902." This clearly describes and purports to sell and transfer title to all the salt included in the act mentioned, wherever it might then be situated. The defendant contends. that the previous sale and conversion of the 963 tons, involving, as it is claimed, the removal of that salt from the defendant's premises or its destruction, excludes that part of the salt from the operation of the contract of sale to the plaintiff. There is no evidence that any part of the salt was destroyed. The evidence merely shows, as the court found, that it had been sold, shipped, and converted by the defendant. It is therefore unnecessary to determine what would be the effect upon the validity of the sale if it had been actually destroyed at the time. Under the contract with the Amalgamated Salt Company, the defendant was the bailee of all the salt, and that company was the bailor. (Civ. Code, secs. 1748, 1822.) It was the defend-

ant's duty, as bailee, to safely keep the salt bailed and deliver it to the bailor or its successor in interest, on demand. (Lawson on Bailments, sec. 22; Story on Bailments, sec. 122.) Neither the wrongful conversion of property to his own use by a bailee nor his wrongful transfer of the possession thereof to another can divest the title of the true owner. This is settled in this state by the decisions in *Howe* v. *Johnson,* 117 Cal. 41, [48 Pac. 978], and *Faulkner* v. *Bank,* 130 Cal. 258, [62 Pac. 462]. The title thus remaining in the Amalgamated Salt Company after the conversion was a species of property, and as such it was subject to sale and transfer by the owner. (Civ. Code, secs. 1044, 1047; *Rice* v. *Whitmore,* 74 Cal. 623, [5 Am. St. Rep. 479, 16 Pac. 501] ; *Curtin* v. *Kowalsky,* 145 Cal. 434, [78 Pac. 962].) The contract of sale by that company to the plaintiff described the salt converted, as well as that remaining in the defendant's possession, and therefore its effect was to transfer to the plaintiff the title to all the salt in controversy wherever situated, and notwithstanding its previous removal by the defendant.

The plaintiff, by virtue of its purchase of all the salt embraced in the contract of December 20, 1902, above quoted, and the extension of the time of making the $1,150 payment from January 1, 1904, to February 1, 1904, was entitled to the immediate possession of all the salt at the time of its purchase thereof. The payment of $1,150 was not a condition precedent to the existence of the right to immediate possession,—at least not until February 1, 1904, when it became due. To avoid all question upon this point, however, the plaintiff paid it before that day, and thus complied with every condition that could- at any time become necesssary to entitle it to demand delivery of the salt from the defendant, including that removed and converted as well as that remaining on hand. It made the demand, and possession was refused. A right of action for possession, or for the value of the salt, if possession could not be recovered, immediately accrued to the plaintiff.

The fact that the defendant had, before the demand, or before the action was begun, parted with the possession of the salt, was no defense. Nor would the fact that plaintiff was vendee of the original bailor affect the case in this particular. This question was fully considered in *Faulkner* v. *Bank,* 130 Cal. 258, [62 Pac. 462]. It was there held that an assignment

of a note by the owner after the bailee had parted with its possession to a stranger transferred the title and right of possession to the owner's assignee, and that the bailee could not defend an action by the assignee for its possession or value on the ground that before the demand by the assignee he had delivered it to a third person, who claimed to be the owner, and that he was therefore unable to deliver possession in compliance with the demand. The opinion declares that the action is of the character formerly known as an action in detinue, and that the rights of the parties are to be determined by the principles of the common law applicable to that form of action. It then quotes passages from 1 Chitty on Pleadings, 138; *Haley* v. *Rowan*, 5 Yerg, 301, [26 Am. Dec. 268]; and *Reeve* v. *Palmer*, 5 C. B., N. S. 84, to the effect that if a bailee wrongfully deliver the goods to another, he will continue liable in detinue for the goods or their value; that it does not lie in his mouth to set up his wrongful act in answer to such action, or to say that he is unable to comply with the demand for possession because of his own breach of duty; and that the burden is on him to show any excuse, such as that his possession ceased before suit brought, by accident or some means beyond his control and without his fault. The opinion proceeds to say that these principles "are eminently just, and are founded on the maxim that no man can take advantage of his own wrong, and they are as applicable now to an action based on a contract of bailment as they were to such action when it had to be brought under the special form of detinue." The following authorities are of similar effect: 14 Cyc. 259, 260; 5 Cyc. 188, 189; 3 Am. & 'Eng. Ency. of Law, 763; Lawson on Bailments, sec. 23; Schouler on Bailments, 2d ed., p. 30, note; Cobbey on Replevin, sec. 212; *Howe* v. *Johnson*, 117 Cal. 41, [48 Pac. 978]; *Serat* v. *Utica*, 102 N. Y. 680, [6 N. E. 795]; *Rogers* v. *Windoes*, 48 Mich. 630, [12 N. W. 882]; *Brady* v. *Whitney*, 24 Mich. 156; *Tome* v. *Dubois*, 73 U. S. 548.

2. The two payments, amounting to $5,750, called for by the contract of December 20, 1902, were duly made as agreed, but no salt was delivered under the contract, prior to February 1, 1904. The plaintiff made the final payment of $1,150 to the defendant in January, 1904, and thereupon demanded delivery of the salt. During the months of February, March, and April, after the suit was begun, the defendant delivered the re-

maining 825 tons. The plaintiff has not paid any additional sum for the expenses of delivering this salt. The court below held that the twenty-five cents per ton for delivery expenses of the salt thus subsequently delivered was not included in the final payment of $1,150, but was additional thereto, basing this conclusion upon the fact that the delivery was made after the making of said final payment. The court was of the opinion that the provision that the delivery expenses were to be deducted from the final payment applied only in case the salt was delivered before that payment was made, and that if it was delivered after that payment the charge was to be an addition to the price. From this it concluded that the failure to pay $206.25 for expenses of delivering the salt delivered after the suit was begun caused the forfeiture of the plaintiff's title to that part of the salt and defeated its right of action, and that the defendant was therefore entitled to judgment.

The contract should not be thus construed. A contract is not to be construed to provide a forfeiture, unless no other interpretation is reasonably possible. The twenty-five cents per ton for expenses of delivery was not to be due until after delivery, and then only to the extent of the salt delivered. Delivery could not be enforced until after the first two money payments, amounting to $5,750, were made. The defendant was given power to sell the salt that might be forfeited, a power which ordinarily requires delivery of possession to make the sale complete, thus implying that the forfeiture was to be of salt in its possession, and not salt delivered to the purchaser. It was evidently expected that all the salt would be delivered long before the $1,150 became due. If so, the amount to be deducted for delivery expenses would be ascertained before that installment was paid. Considering all the provisions of the contract, together with the surrounding circumstances, we think its true construction is that the provision for a forfeiture upon failure to make any payment specified in the contract referred only to those sums which constituted the part of the purchase price of the salt payable in money, and which might become due before delivery, and not to the charge of twenty-five cents per ton for sewing, sacking, and delivery of the salt on board cars, which was not to be paid until the 13th of the month succeeding such delivery. It is unnecessary in this action to determine whether or not the defendant is entitled to

further charges for these delivery expenses, after having received full payment of the final installment of $1,150. Our conclusion is that after having paid the final installment the failure of the plaintiff to pay delivery charges for subsequent deliveries did not cause the title to such salt to revert to the defendant.

3. The contract of sale from the Amalgamated Salt Company to the plaintiff also contained a provision that if payment of the price was not made as specified the title should revert to the Amalgamated Salt Company. The court found that at the time of the trial the plaintiff had not yet paid that company for the 825 tons of salt received by it under the contract. It would seem that from this fact the court believed that the plaintiff's original title to the property had been defeated and that it could not recover possession. We think this was a matter of no concern to the defendant. If a forfeiture took place, as was claimed, it was after the suit was begun. The enforcement of such forfeiture could be waived. Some affirmative action by the Amalgamated Salt Company would be necessary as evidence of an intention to enforce it. It does not appear that any such action was taken, and its enforcement will not be presumed in favor of the defendant for the purpose of defeating this action.

4. There is a claim by the plaintiff that the finding that the salt which was the subject of the sale of December 20, 1902, was only 1,788 tons is not sustained by the evidence, and that the court should have found that it consisted of 4,600 tons. It was not seriously contended that the evidence was such as to require a finding that there was at that time 4,600 tons of salt on the premises "lifted, sacked and stored in piles, bins and warehouses," as stated in the contract, nor that any specific quantity was described in the contract. The contention is in this behalf that one Wadsworth and one Babcock, as agents of the defendant, negotiated the sale of the salt to the Amalgamated Salt Company, that they then represented to that company that there was at least 4,600 tons of salt situated as described, and that because of these representations the defendant is, as a matter of law, estopped to deny that any less quantity was so situated and sold, and that this estoppel operates not only in favor of that company, but also in favor of plaintiff, as defendant's vendee.

We need not determine the soundness of the propositions that the representations created an estoppel, and that the estoppel operates in favor of the vendee. There was evidence from which the court may have concluded that Wadsworth was not the agent of the Western Salt Company, but was the agent and promoter of the Amalgamated Salt Company; that in that capacity, and before the latter company was incorporated, he visited the salt works of defendant and saw the salt there on hand, and that whatever statements were made to the Amalgamated Salt Company were made by him in his report to that company after its incorporation, as its own agent; and that the principal object of the Amalgamated Salt Company in making the contract was not to purchase any particular quantity of salt, but to buy the stock of salt which the Western Salt Company then had ready for market, so as to prevent the continued competition of the latter in the salt business. Upon such facts the court might justly hold that the contract should be taken literally, as its words imply,—that is, as a sale of the salt on hand at that place ready for market, without especial regard to its quantity. We express no opinion upon the question whether it could, under different circumstances, be construed otherwise. If the court believed the facts were as above indicated, there could be no estoppel.

5. The plaintiff further contended that the pleadings admitted that the amount of salt on hand at the time of the sale on December 20, 1902, was 4,600 tons. We need not decide this proposition. It may be conceded that the pleadings are somewhat ambiguous upon that point; but as the judgment must be reversed and a new trial had, the defendant may be allowed to amend its pleadings, if it so desires, so as to remove all doubt upon that subject.

We may add, with respect to the value of the salt, that evidence of the market value of salt at retail, in lots of less than a ton, in the city of San Diego would be a very unsatisfactory measure of value of salt in lots of one thousand tons or more at wholesale, and that unless such evidence was supplemented by proof of the difference between the wholesale and retail prices it would not of itself enable the court to find the value. The defendant is liable only for the wholesale price or value,— that is, of the going price when sold in similar lots by manufacturers to the trade.

The judgment and order are reversed.

Sloss, J., and Angellotti, J., concurred.

Hearing in Bank denied.